## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| ENERGY AUTOMATION SYSTEMS, INC., | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 3:06-1079** |
| | ) | **Judge Trauger** |
| v. | ) | |
| | ) | |
| XCENTRIC VENTURES, LLC, d/b/a | ) | |
| BADBUSINESS BUREAU and/or | ) | |
| BADBUSINESSBUREAU.COM and/or | ) | |
| RIPOFFREPORT.COM, and EDWARD | ) | |
| MAGEDSON a/k/a ED MAGEDSON, | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM

This case comes before the court on a Motion to Dismiss for Lack of Personal Jurisdiction filed by the defendants (Docket No. 17), to which the plaintiff has responded (Docket No. 25), and on a Motion to Lift Stay on Discovery filed by the plaintiff (Docket No. 24), to which the defendants have responded (Docket No. 31), and the plaintiff has replied (Docket No. 33). For the reasons stated herein, the defendants' Motion to Dismiss will be denied. The portion of the defendants' Motion to Dismiss that presents arguments going to the merits of the plaintiff's claims will be converted to a Motion of Summary Judgment. The plaintiff's Motion to Lift Stay on Discovery will be granted.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Defendant Xcentric Ventures, LLC ("Xcentric"), operates the Bad Business Bureau, a

1

company that purports to advocate on behalf of consumers.[1]  The Bad Business Bureau provides

a forum in which consumers may accuse companies and individuals of various "rip-off" and

"bad business" offenses.  This forum is located on a website that may be accessed through either

of two domain names: ripoffreport.com or badbusinessbureau.com.  The website solicits and

receives complaints from all over the country and recommends tactics for writing "rip-off

reports," providing sample questions to ask companies and advice for locating similarly situated

consumers on the internet.  The website allows consumers to contact its own "professionals" for

"information and help" via e-mail.  In addition, the plaintiff alleges that Xcentric offers some

individuals compensation for submitting reports and has encouraged consumers to gather and

post specific information about targeted companies.  The plaintiff alleges, on information and

belief, that the defendants have developed and/or created titles, headings, and editorial messages

concerning individuals and/or companies targeted by the reports.

Xcentric is a limited liability company organized under Arizona law, and its principal

office is located in Arizona.  Defendant Edward Magedson created and currently operates the

website.  He is a citizen of Arizona.  In addition to its other services, the website promotes and

sells Mr. Magedson's "Rip-Off Revenge Guide," a book that offers advice on taking revenge

against fraudulent businesses, and the website offers to assist customers in organizing class

---

[1]In accordance with the standard of review appropriate for Rule 12(b)(2) motions,
discussed below, unless otherwise indicated, the facts have been drawn from the plaintiff's
Amended Complaint (Docket No. 15), the defendants' Motion to Dismiss for Lack of Personal
Jurisdiction (Docket No. 17), the plaintiff's Motion to Lift Stay (Docket No. 24), the plaintiff's
Response to the defendants' Motion to Dismiss  (Docket No. 25), the plaintiff's Declaration of
Paul B. Bleiweiss (Docket No. 26), the defendants' Response to the plaintiff's Motion to Lift
Stay (Docket No. 31), and the plaintiff's Reply to the defendants' Response to the Motion to Lift
Stay (Docket No. 33).

action lawsuits and in seeking media attention.  The website also solicits donations via paypal.

The plaintiff, Energy Automated Systems, Inc. ("EASI") is a Tennessee corporation. EASI distributes equipment designed to reduce the volume of electricity consumed by electric motors, lighting equipment, air conditioning and refrigeration equipment, and other electric-powered devices.  EASI conducts its business through a dealer network that markets and distributes EASI's products.

In recent years, EASI has been featured on the defendants' website.  EASI has been listed on the website's "Top Rip-Off Links" and has been the subject of various "rip-off reports." Those reports have included titles, headings and editorial messages that, the plaintiff alleges, were created by the defendants, stating that EASI's dealerships are a "complete" and "long running" "scam," that EASI is a "damn scam ripoff business from hell," that EASI's Chief Executive Officer and other employees are "crooked" and "crooks," that "EASI likes to threaten anyone that complains whether dealer or ex-employee" and that EASI has engaged in "fraud." (Docket No. 5 at ¶ 17).

The website lists Mr. Magedson as the "EDitor" and as the "Editor in Chief" and provides an e-mail address to reach Mr. Magedson at "EDitor@RipoffReport.com."  The plaintiff alleges that the website has included messages stating that "meaningless" or "trivial" comments are disfavored and will not be accepted, while "solid" and "productive" reports are desired, and that "especially convincing" stories can be picked up on the home page.

The plaintiff alleges that the defendants actively solicited reports about EASI and made suggestions regarding the composition of those reports.  In support of this allegation, the plaintiff has supplied an e-mail from EDitor@RipoffReport.com to an individual regarding EASI stating,

"This is great . . . Can you post something or part of the e-mail below?  This would be great, and it would definitely piss them off!" (Docket No. 25, Ex. 2, p. 1).

The defendants allege that the website does not create or change any content provided in individual reports, including titles, and has provided affidavits from Mr. Magedson and other employees supporting those allegations.  Along with Mr. Magedson's affidavit, the defendants have submitted "screen shots" of the website, illustrating the report-making process.  The screen shots show that the website does provide generic advice, suggestions for creating titles, and a list of possible words to be used as categories.  In each of the defendants' affidavits, the employees state that they did not create any part of the EASI reports at issue and have no knowledge of another employee having done so.

The defendants allege that, as a matter of policy, the website never removes a rip-off report, once it has been posted.  Instead, the website invites concerned parties to write rebuttals to the "rip-off reports" with which they disagree.  Those rebuttals appear beneath the original report.  In addition, the defendants have created the "Rip-off Report Corporate Advocacy Business Remediation & Consumer Satisfaction Program," pursuant to which, for a fee, the defendants will investigate "rip-off reports" targeting member companies and post more prominent rebuttals to those reports.  According to information provided in an e-mail from EDitor@RipoffReport.com to the plaintiff, once a company has paid for this service, "we can make your comments come first, and we can add something permanent and positive to the title along with a review after interviewing your company on the charges made against you." (Docket No. 25, Ex. 3 at p. 7).

On May 22, 2006, Joseph Merlo, EASI's Chief Executive Officer, contacted Mr.

4

Magedson at EDitor@RipoffReport.com to discuss the negative reports targeting EASI. Mr. Merlo stated that, in a separate litigation, EASI had learned that "virtually all" of the negative reports had been authored by the same man, under different aliases. In light of the fact that EASI had this man's sworn, videotaped testimony, admitting to having authored these reports under various aliases, EASI requested that Mr. Magedson remove them.

Mr. Magedson refused to remove any of the reports because it was against his company's policy to ever remove reports, regardless of evidence that they contained false information. Instead, Mr. Magedson suggested that EASI join the "Rip-off Report Corporate Advocacy" program, claiming that once EASI joined the program, the entire experience would work in favor of EASI, as potential customers would learn how effectively EASI had handled this situation. Mr. Merlo did not express interest in joining the "Rip-off Report Corporate Advocacy" program, stating that "[i]t would be a simple matter to review the videotape or read the written transcript to know who is telling the truth." Mr. Magedson reiterated his company's policy against removing reports and again touted the "Rip-off Report Corporate Advocacy" program as a possible solution. The exchange ended on a rather heated note.

EASI filed this action on November 6, 2006, alleging: (1) defamation, (2) violation of the Tennessee Consumer Protection Act, T.C.A. §§ 47-18-101, *et seq.*, (3) interference with business relations, (4) civil conspiracy, (5) violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO") under 18 U.S.C. § 1962(c), and (6) violation of RICO under 18 U.S.C. § 1962(d). (Docket No. 1) EASI filed an amended complaint on March 5, 2006 alleging: (1) defamation, (2) violation of the Tennessee Consumer Protection Act, (3) interference with business relations, and (4) civil conspiracy. (Docket No. 15) The defendants filed a Motion to

5

Dismiss for Lack of Personal Jurisdiction under Rule 12(b)(2) of the Federal Rules of Civil Procedure on March 26, 2007. (Docket No. 17) EASI filed a Motion to Lift Stay on Discovery on April 11, 2007.

<u>ANALYSIS</u>

**I.      Standard of Review**

The defendants have filed a Motion to Dismiss, pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure, asserting that this court lacks personal jurisdiction over the defendants. In this Circuit, there is a well-defined procedural design aimed at guiding district courts in their disposal of Rule 12(b)(2) motions to dismiss for lack of personal jurisdiction. *Dean v. Motel 6 Operating, L.P.,* 134 F.3d 1269, 1271-72 (6th Cir.1998); *Theunissen v. Matthews,* 935 F.2d 1454, 1458 (6th Cir.1991). To begin, the plaintiff has the burden of establishing the existence of jurisdiction, once a 12(b)(2) motion is filed. *Theunissen,* 935 F.2d at 1458. In so doing, the plaintiff may not simply rely on the allegations set forth in the complaint but must, by affidavit or otherwise, set forth specific facts showing the existence of jurisdiction. *Id.* Once the court is faced with a properly supported 12(b)(2) motion and opposition, it has three procedural alternatives: "it may decide the motion upon the affidavits alone; it may permit discovery in aid of deciding the motion; or it may conduct an evidentiary hearing to resolve any apparent factual questions." *Id.* (citing *Serras v. First Tennessee Bank Nat. Ass'n.,* 875 F.2d 1212, 1214 (6th Cir.1989)).

The alternative selected will influence the burden of proof necessary for the plaintiff to defeat the motion. *Id.* If the court chooses to rule on the 12(b)(2) motion without conducting an evidentiary hearing, then the plaintiff need only make out a *prima facie* case for jurisdiction.

6

*CompuServe, Inc. v. Patterson,* 89 F.3d 1257, 1262 (6th Cir.1996). In such an instance, not only will the pleadings and affidavits be considered in the light most favorable to the plaintiff, but the court will not consider or weigh the controverting assertions of the defendant.[2] *Id.* "Dismissal in this procedural posture is proper only if all the specific facts which the plaintiff[] alleges collectively fail to state a prima facie case for jurisdiction." *Id.*

On the other hand, if the court chooses to exercise its discretion and orders an evidentiary hearing to resolve disputed issues of fact or make determinations as to credibility, then the plaintiff must establish personal jurisdiction by a preponderance of the evidence. *Dean,* 134 F.3d at 1272 (quoting *Serras,* 875 F.2d at 1214). The same standard will apply if the matter is either reserved for decision at trial or if there is no reason to conduct an evidentiary hearing on the issue, such as where there is no real dispute as to the facts. *Id.*

In the present case, the defendants have raised the Communications Decency Act, 47 U.S.C. § 230(c)(1) as a complete defense to liability under each of the plaintiff's claims. In support of this defense, the defendants have filed with the court a declaration and several affidavits that dispute some of the facts alleged in the Amended Complaint. The plaintiff has requested additional discovery to address the facts alleged in the affidavits. As will be further discussed below, the defendants' arguments under the Communications Decency Act do not properly dispute this court's personal jurisdiction over the defendants, but rather attack the merits of the plaintiff's underlying claims.

---

[2]This latter rule was adopted to prevent non-resident defendants "from regularly avoiding personal jurisdiction simply by filing an affidavit denying all jurisdictional facts . . . ." *Theunissen,* 935 F.2d at 1459.

7

Because the defendants' arguments on the merits rely on affidavits and other documents to contradict the allegations in the Amended Complaint, those arguments are more properly analyzed under the Sixth Circuit's summary judgment standard. Rule 56(f) of the Federal Rules of Civil Procedure affords the plaintiff an appropriate period of discovery to rebut the defendants' proffered evidence.

However, it is not necessary for the plaintiff to rebut the defendants' evidence attacking the merits of the plaintiff's claims in order for the court to determine whether it may exercise personal jurisdiction in this case. Therefore, the court must determine what standard to apply in the unique situation where the defendants have brought facts into dispute which are relevant to the merits of the case, and where the plaintiff has requested additional discovery on those facts, but where there is no "real dispute" as to the facts underlying the parties' personal jurisdiction arguments.

In *Dean*, the Sixth Circuit Court of Appeals explained why a relatively light standard for the plaintiff is appropriate in most situations where the court rules without extended discovery or an evidentiary hearing. However, as an exception to that rule, the court also stated:

> As a final consideration, we would not use this standard if the reason for not having an evidentiary hearing was that there was no "real dispute" as to the facts or to the extent of discovery. . . . If there was no such dispute, it would be a waste of resources to conduct an evidentiary hearing, but we would not prejudice defendants because of this desire for efficiency. In such cases, plaintiffs face the same burden as they would if there had been an evidentiary hearing: proof of jurisdiction by a preponderance of the evidence.

134 F.3d at 1272. Although this exception did not apply to *Dean* itself, the court finds that it applies to the case at hand. Because the only facts in dispute concern the merits of the plaintiff's claims themselves, and not this court's personal jurisdiction, it would be a waste of resources for

8

the court to allow the parties additional discovery on the issue of personal jurisdiction and to hold a hearing on that issue. Accordingly, the court will apply the "preponderance of the evidence" standard to the personal jurisdiction question. With this standard in mind, the court turns to an analysis of its personal jurisdiction over the defendants.

## II.    Personal Jurisdiction

A federal court may only exercise personal jurisdiction in a diversity case if such jurisdiction is authorized by the law of the state in which the court sits and is otherwise consistent with the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution. *Youn v. Track, Inc.,* 324 F.3d 409, 417 (6th Cir.2003); *Neogen Corp. v. Neo Gen Screening, Inc.,* 282 F.3d 883, 888 (6th Cir.2002). "Where the state long-arm statute extends to the limits of the due process clause, the two inquiries are merged and the court need only determine whether exercising personal jurisdiction violates due process." *Bridgeport Music, Inc. v. Still N the Water Publ'g,* 327 F.3d 472, 477 (6th Cir.2003) (citing *Nationwide Mut. Ins. Co. v. Tryg Int'l Ins. Co., Ltd.,* 91 F.3d 790, 793 (6th Cir.1996)); *see also Aristech Chem. Int'l Ltd. v. Acrylic Fabricators Ltd.,* 138 F.3d 624, 627 (6th Cir.1998). The Tennessee long-arm statute has been interpreted to extend to the limits of due process.[3] *See Bridgeport Music,* 327 F.3d at 477; *see*

---

[3]Tennessee's long-arm statute, as codified at Tenn.Code Ann. § 20-2-214, provides, in relevant part:

1.  (a) Persons who are nonresidents of Tennessee and residents of Tennessee who are outside the state and cannot be personally served with process within the state are subject to the jurisdiction of the courts of this state as to any action or claim for relief arising from:

    (1) The transaction of any business within the state;

    (2) Any tortious act or omission within this state;

9

*also Neal v. Janssen,* 270 F.3d 328, 331 (6th Cir.2001); *Masada Inv. Corp. v. Allen,* 697 S.W.2d 332, 334 (Tenn.1985). Therefore, the court need only address whether exercising personal jurisdiction over the defendants is consistent with federal due process requirements.

The underlying principle behind the due process analysis is that a defendant who is not physically present in the forum must have "certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Youn,* 324 F.3d at 417 (quoting *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)); *see also Neogen,* 282 F.3d at 889. The Supreme Court has distinguished between "general" jurisdiction and "specific" jurisdiction as distinct bases for personal jurisdiction, depending on the nature of the contacts between the defendant and the forum state. *See Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414, 104 S.Ct. 1868, 80

—————————————

(3) The ownership or possession of any interest in property located within this state;

(4) Entering into any contract of insurance, indemnity, or guaranty covering any person, property, or risk, located within this state at the time of contracting;

(5) Entering into a contract for services to be rendered or for materials to be furnished in this state;

(6) Any basis not inconsistent with the constitution of this state or of the United States;

(7) Any action of divorce, annulment or separate maintenance where the parties lived in the marital relationship within this state, notwithstanding one party's subsequent departure from this state, as to all obligations arising for alimony, custody, child support, or marital dissolution agreement, if the other party to the marital relationship continues to reside in this state.
Tenn. § 20-2-214(a) (2004). In 1997, the General Assembly codified additional provisions to the long-arm statute, including a provision conveying personal jurisdiction based on conduct, Tenn.Code. Ann. § 20- 2-223. *See Chenault v. Walker,* 36 S.W.3d 45, 51 (Tenn. 2001).

10

L.Ed.2d 404 (1984); *see also Youn,* 324 F.3d at 417; *Bridgeport Music,* 327 F.3d at 477.

Specific jurisdiction exists where "a State exercises personal jurisdiction over a defendant in a suit arising out of or related to the defendant's contacts with the forum." *Youn* (quoting *Helicopteros,* 466 U.S. at 414 n. 8, 104 S.Ct. 1868, 80 L.Ed.2d 404). General jurisdiction exists where a defendant's contacts with the forum state are "substantial" and "continuous and systematic." Thus, where general jurisdiction is present, a state may exercise personal jurisdiction over a defendant in a suit not arising out of or related to the defendant's contacts with the forum. *See Youn,* 324 F.3d at 418. The plaintiff has alleged that both specific and general jurisdiction exist in the case at hand, and the court will analyze both possible avenues.

### B.    General Personal Jurisdiction

General personal jurisdiction "is proper only where 'a defendant's contacts with the forum state are of such a continuous and systematic nature that the state may exercise personal jurisdiction over the defendant even if the action is unrelated to the defendant's contacts with the state.'" *Bird v. Parsons,* 289 F.3d 865, 873 (6th Cir. 2002) (quoting *Third Nat'l Bank in Nashville v. WEDGE Group, Inc.,* 882 F.2d 1087, 1089 (6th Cir. 1989), *cert. denied,* 493 U.S. 1058, 110 S.Ct. 870, 107 L.Ed.2d 953 (1990)).

In *Bird*—in addition to the specific personal jurisdiction analysis outlined below—the Sixth Circuit addressed whether the maintenance of a website accessible to anyone over the internet was sufficient to justify general personal jurisdiction, ultimately holding that it was not. The website at issue in *Bird* enabled the defendant to do business with residents in the state at issue—Ohio—by allowing those residents to register domain names on the site. Citing case law

11

for the general proposition that "'engaging in commerce with residents of the forum state is not in and of itself the kind of activity that approximates physical presence within a state's borders'" the Sixth Circuit reasoned that a website that merely allowed the defendant to do business in Ohio was not sufficient for the exercise of general personal jurisdiction. *Id.* (quoting *Bancroft & Masters, Inc. v. Augusta Nat'l Inc.*, 223 F.3d 1082, 1086 (9th Cir. 2000). In addition, the court in *Bird* found it significant that "unlike direct marketing, [potential customers] initiate[d] contact with [the defendant]." *Id.*

Similarly, in *First Tennessee Nat'l Corp. v. Horizon Nat'l Bank*, 225 F. Supp. 2d 816, 821 (W.D. Tenn. 2002), the Western District of Tennessee held that, although it was sufficient to meet the "purposeful availment" requirement for specific jurisdiction, the operation of the defendant's website, which "permit[ted] Tennessee residents to obtain mortgage loans, obtain expert loan advice, and receive daily commentary" did not justify the exercise of general personal jurisdiction. The website was found to include the following activities: it "encourage[d] consumers to complete an on-line mortgage application; to join an e-mail list to receive daily commentary on mortage-related topics; to send in on-line testimonials; and to sign up for the 'rate-tracker' service whereby customers may complete an online form to receive notification via e-mail when a target rate becomes available." *Id.* at 820. In addition, the website "permit[ted] customers to calculate the amount of their mortgage payments, to determine whether they pre-qualify for a loan, and to obtain personalized service from 'expert mortgage loan advisors' via e-mail." *Id.* Nevertheless, citing *Bird*, the court held that the website was "definitely an insufficient basis upon which to base general jurisdiction." *Id.* at 821.

In the case at hand, the plaintiff urges that the defendant's operation of its website and its

12

inclusion of Tennessee businesses and individuals on that website justifies the exercise of general personal jurisdiction. Specifically, the plaintiff alleges that the following activities constitute "continuous and systematic contacts" for the purposes of general personal jurisdiction: (1) that the defendants have "edited and published" over two thousand reports concerning Tennessee companies and individuals; (2) that the defendants have "actively solicited, encouraged and received" reports from Tennesseans about Tennessee companies; (3) that the defendants have offered for sale, via their website, the "Rip-off Report Corporate Advocacy" program; (4) that the defendants communicated with at least two Tennessee residents (employees for the plaintiff) about a Tennessee company (the plaintiff); (5) that the defendants' website solicits and receives donations; (6) that the defendants' website offers individuals the prospect of compensation for submitting reports; (7) that the defendants have recommended tactics for making consumer complaints; (8) that the defendants' website "advertised, promoted and offered to sell" the "Rip-off Revenge Guide"; (9) that the defendant's website offered to help organize lawsuits; (10) that the website enabled visitors to search for reports by "Tennessee"; (11) that the website offered to assist consumers in obtaining media attention; (12) that the website sold advertising space; and (13) that the website "created and developed original content regarding a Tennessee company."

The above-listed items do not meaningfully differ from the activities performed on the websites at issue in the *Bird* and *First Tennessee Nat'l Corp.* cases. Although the plaintiff alleges various forms of solicitation, promotion, and advertisement, it is important to note that those allegations—and the evidence in the record—are limited to activities that took place on the website itself. The defendants have not sent agents to Tennessee or promoted services directly to

13

Tennesseans in any way that is meaningfully distinct from the daily operation of the website. The plaintiff has shown, via an e-mail exchange, that an agent for the defendants did suggest that a consumer include specific information in a complaint. This evidence may prove to be more important in other stages of the case, but it is not dispositive here: the evidence does not show that the defendants were the party that initiated contact in this exchange. As in *Bird*, the plaintiff has not shown evidence of "direct marketing" of their services in Tennessee and, instead, the evidence indicates that potential customers have "initiate[d] contact" with RipoffReport.com.

The contacts between the defendants and Tennessee are very similar to those described in *First Tennessee Nat'l Corp.* In *First Tennessee Nat'l Corp.*, the website at issue was not merely a passive vehicle for completing loan transactions, but it also marketed to its customers expert loan advice and daily commentary and allowed for various other interactions between the defendant and its customers, some of them including the transmission of original content. Similarly, although Ripoffreport.com allows for a variety of potential interactions between the website and its customers, those interactions all fall under the rubric of a website conducting business over the internet. Accordingly, the plaintiff has failed to demonstrate a basis for the exercise of general personal jurisdiction.

### A.     Specific Personal Jurisdiction

In *Southern Machine Co. v. Mohasco Industries, Inc.,* the Sixth Circuit established a three-part test for determining whether the exercise of specific jurisdiction was consistent with the principles of due process:

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequence caused by the defendant must have had a substantial

14

enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

401 F.2d 374, 381 (6th Cir.1968), *quoted in Bridgeport Music,* 327 F.3d at 477-78; *see also Youn,* 324 F.3d at 418; *Calphalon Corp. v. Rowlette*, 228 F.3d 718, 721-24 (6th Cir. 2000) (applying the *Mohasco* factors).

### 1.    Purposeful Availment

The first *Mohasco* prong requires that the defendant "purposefully avail[] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Dean,* 134 F.3d at 1273 (quoting *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)). This requirement "ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts, or of the unilateral activity of another party or a third person." *Id.* Purposeful availment is "something akin to a deliberate undertaking to do or cause an act or thing to be done [in the forum state] or conduct which can be properly regarded as a prime generating cause of the effects resulting in [the forum state], something more than a passive availment of the [forum state's] opportunities." *Bridgeport Music,* 327 F.3d at 478 (quoting *Neogen,* 282 F.3d at 891) (alteration in original).

The Sixth Circuit has held that the purposeful availment prong is satisfied "when the defendant's contacts with the forum state proximately result from actions by the defendant *himself* that create a substantial connection with the forum State, and when the defendant's conduct and connection with the forum are such that 'he should reasonably anticipate being haled into court there.'" *Bridgeport Music,* 327 F.3d at 478 (quoting *CompuServe,* 89 F.3d at 1263) (internal quotation marks omitted).

15

In the internet context, the Sixth Circuit has adopted the rule that a "defendant purposefully avails itself of the privilege of acting in a state through its website if the website is interactive to a degree that reveals specifically intended interaction with residents of the state." *Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 890 (6th Cir. 2002) (citing *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119, 1124 (W.D. Pa. 1997)); *see also Bird*, 289 F.3d at 874. In *Neogen*, the Sixth Circuit adopted the "sliding scale" approach to purposeful availment in the internet setting first elaborated by the Western District of Pennsylvania in *Zippo*, stating:

> In *Zippo*, the district court held that the defendant manifested its purposeful availment of the privilege of acting in Pennsylvania when it 'repeatedly and consciously chose to process Pennsylvania residents' applications and to assign them passwords,' knowing that the result of these [i]nternet contacts would be to perform services for Pennsylvania customers in part through the transmission of electronic messages to Pennsylvania. Such intentional interaction with the residents of a forum state, the *Zippo* court concluded, is evidence of a conscious choice to transact business with inhabitants of a forum state in a way that the passive posting of information accessible from anywhere in the world is not.

*Neogen*, 282 F.3d at 890 (internal citations omitted). The *Neogen* court further stated that "the maintenance of [a] website, in and of itself, does not constitute . . . purposeful availment." *Id*. However, a fully interactive website, as opposed to one that "passively posted information," would sufficiently demonstrate that the defendant had purposefully availed itself of the privilege of acting in the state at issue. *Id*. at 890-91. Because the defendant's website was not the only contact within the state, the *Neogen* court did not ultimately address where the website in that case fell on the *Zippo* continuum. *Id*. at 891.

In *Bird*, however, the court did reach that question. The website at issue in *Bird* permitted Ohio residents to register domain names and, according to the plaintiffs in that case,

16

had accepted the business of 4,666 Ohio residents. *Bird*, 289 F.3d 865, 874. The court held that, "[a]lthough it is unclear whether registrants who use [the] website do so on a repeated basis, the proffered evidence that [the defendant] regularly chooses to do business with Ohio residents is sufficient to constitute purposeful availment." *Id.* at 874 (citing *Zippo*, 952 F. Supp. at 1126-27). Accordingly, although the website was not sufficient to demonstrate general personal jurisdiction, the *Bird* court ultimately held that it could exercise specific personal jurisdiction, based on a cause of action that arose from the defendant's website. *Id.* at 875-76.

Similarly, in *First Tennessee Nat'l Corp.*, 225 F. Supp. at 821, the court found that the defendant's website, which contained various interactive features, such as permitting Tennessee residents to "obtain mortgage loans, obtain expert loan advice, and receive daily commentary" constituted personal availment for the purposes of specific personal jurisdiction, although it was insufficient to warrant the exercise of general personal jurisdiction. *Id.* Further, although the plaintiff "ha[d] not alleged that [the defendant] ha[d] actually serviced a Tennessee resident," the court found it meaningful that the defendant "ha[d] not alleged that it ha[d] refrained from doing business with Tennessee residents," and that the defendant's "website evidences that it is willing and capable of providing services to Tennessee residents." *Id.* Finally, the court reasoned, "[g]iven that the plaintiff 'need only make a prima facie showing of jurisdiction,' the defendant's alleged maintenance of a highly interactive website that solicits Tennessee customers is a sufficient basis to find that the defendant has purposefully availed itself of acting in the forum state." *Id.* (citing *Quality Solutions v. Zupanc*, 993 F. Supp. 621, 623 (N.D. Ohio 1997)).[4]

---

[4]Although, in the present case, the court is applying the "preponderance of the evidence" standard, the court's reasoning in *First Tennessee Nat'l Corp.* remains persuasive. In *First Tennessee Nat'l Corp.*, the court accepted the plaintiff's allegations regarding the interactivity of

17

In the case at hand, although the parties dispute the level of control that the defendant has exercised with regard to the content of the individual "rip-off reports," they do not otherwise dispute the level of interactivity of the website.  As outlined above, the website is very interactive—it provides a host of services to the public and to private businesses.  The website allows individuals to categorize their reports under various headings and to search other reports by category, recommends tactics for consumer complaints, offers to organize lawsuits, markets a book authored by Mr. Magedson, and offers companies additional private services.  Even assuming that the defendants do not contribute to the content of the rip-off reports, there is ample evidence demonstrating that the website is interactive.  As in *Bird*, and *Tennessee Nat'l Corp.*, the court has found that Ripoffreport.com's services do not demonstrate a basis for general personal jurisdiction; however, as in both cases, the court finds that the website does constitute purposeful availment of the privilege of acting in the forum state, for the exercise of specific personal jurisdiction.

## 2.    Cause of Action Arising From the Contacts

The second *Mohasco* prong requires that the plaintiff's claims "arise from" the defendants' contacts with Tennessee.  The Sixth Circuit has observed that, "[i]f a defendant's contacts with the forum state are related to the operative facts of the controversy, then an action will be deemed to have arisen from those contacts."  *CompuServe,* 89 F.3d at 1267; *see also Bird v. Parsons,* 289 F.3d at 875.  "Although this does not require that the cause of action arise formally and directly from defendant's contacts with the forum, the cause of action must still

---

the website on their face, whereas in this case, the parties do not dispute the various interactive services that ripoffreport.com offers the public.  Evidence of those interactive services is found in the defendants' filings to this court as well as in the plaintiff's filings.

'have a substantial connection with the defendant's in-state activities.'" *Dean,* 134 F.3d at 1275

(quoting *Third Nat'l Bank in Nashville v. WEDGE Group, Inc.,* 882 F.2d 1087, 1091 (6th Cir.

1989), *cert. denied,* 493 U.S. 1058, 110 S.Ct. 870, 107 L.Ed.2d 953 (1990)).

The Sixth Circuit has advised that "[o]nly when the operative facts of the controversy are

not related to the defendant's contact with the state can it be said that the cause of action does not

arise from that [contact]." *Mohasco,* 401 F.2d at 384 n. 29. In the case at hand, the plaintiff has

shown that the cause of action does arise from the defendants' in-state activities, via

Ripoffreport.com. The operative facts in this case include allegations that the defendant

solicited, edited, and contributed to defamatory statements about the plaintiff, a Tennessee

corporation, through its website. The defendants' contacts with Tennessee stem from the

website on which the defamatory statements about the plaintiff were made. Therefore, in light of

"the lenient standard that applies when evaluating the 'arising from criterion,'" the court

concludes that the plaintiff's claims "arise from" the defendants' contacts with Tennessee. *Bird*,

289 F.3d at 875 (holding that the "arise from" standard is met where "the operative facts are

at least marginally related to the alleged contacts").

### 3.    Reasonableness of Exercise of Jurisdiction

The third *Mohasco* prong requires that the acts of the defendant or consequences caused

by the defendant have a substantial connection with the forum state so as to make the exercise of

jurisdiction over the defendant reasonable. In analyzing this requirement, courts are directed to

consider several factors, including "the burden on the defendant, the interest of the forum state,

the plaintiff's interest in obtaining relief, and the interest of other states in securing the most

efficient resolution of controversies." *CompuServe,* 89 F.3d at 1268; *see also Youn,* 324 F.3d at

419; *Bird,* 289 F.3d at 875. If the first two *Mohasco* requirements are met, an inference arises that the third factor is also satisfied. *See Bird,* 289 F.3d at 875; *Mohasco,* 401 F.2d at 384. Conversely, the Sixth Circuit in *Dean* observed that it would not pursue the "complex inquiry" posed by the third requirement where the "lack of purposeful availment is dispositive." *Dean,* 134 F.3d at 1275.

Because the first two *Mohasco* elements have been established, an inference arises that the exercise of jurisdiction over the defendants is reasonable. Further, the court finds that "the burden on the defendant, the interest of the forum state, the plaintiff's interest in obtaining relief, and the interest of other states" also weigh in favor of the court's exercise of jurisdiction in this case. Neither Mr. Magedson nor Xcentric Corp. is a resident of Tennessee and, therefore, travel costs will present some burden to the defendants. This burden is outweighed by the remaining factors, including Tennessee's legitimate interest in protecting the interests of its residents and businesses, and the plaintiff's own interest in obtaining timely relief. Although the State of Arizona also has an interest in this action, it should be noted that, due to the national scope of the defendants' website, many more states also have an interest in the timely adjudication of the issues in this case. Accordingly, the court finds that the third *Mohasco* prong has been fulfilled and, in conclusion, that, under the "preponderance of the evidence" standard, the plaintiff's pleadings and affidavits are more than sufficient to support the exercise of personal jurisdiction in this case.[5]

---

[5]The defendants additionally assert that a purported forum selection clause binds the plaintiff to the state of Arizona's exclusive jurisdiction. The defendant alleges that "every time a user submits a report to Rip-Off Report for publication, the user is required to agree that the State of Arizona shall have exclusive jurisdiction over any dispute arising from the report." (Docket No. 17 at p. 10-11). However, the plaintiff did not submit a "rip-off report" to the

## II.     Immunity Under the Communications Decency Act

The defendants assert immunity under the Communications Decency Act ("CDA"), 47

U.S.C. § 230(c)(1) as a defense to personal jurisdiction.  The relevant statutory language

provides:

> No provider or user of an interactive computer service shall be treated as the
> publisher or speaker of any information provided by another information content
> provider.

47 U.S.C. § 230(c)(1).  The act defines "interactive computer service" as:

> [A]ny information service, system, or access software provider that provides or
> enables computer access by multiple users to a computer server, including
> specifically a service or system that provides access to the Internet and such
> systems operated or services offered by libraries of educational institutions.

47 U.S.C. § 239(f)(2).  The act defines "information content provider" as:

> [A]ny person or entity that is responsible, in whole or in part, for the creation or
> development of information provided through the Internet or any other interactive
> computer service.

47 U.S.C. § 239(f)(3).  The statutory language does not speak in terms of immunity and does not

deprive courts from exercising personal jurisdiction, but rather provides a defense to liability for

any cause of action—such as a claim for defamation—that would treat an "interactive computer

service" as a publisher or speaker of information.

Courts have treated this statutory language as granting internet service providers and

---

defendants' website, and the defendants have not alleged that the plaintiff agreed to their forum
selection in any other manner.  Accordingly, the defendants' forum selection clause can have no
binding effect on the plaintiff.  See 16 James Wm. Moore, *Moore's Federal Practice* § 108.53
[5][b][i] (3d. ed. 2006) ("A prorogation clause generally binds only the parties to the agreement
and, thus, may not be binding on third parties."); *Dayhoff Inc. v. H.J. Heinz Co.*, 86 F.3d 1287,
1296 (3d Cir. 1996) (holding that a forum selection clause and arbitration clause "can be
enforced only by the signatories to those agreements").

websites immunity from liability in defamation suits—provided that the service provider or website in question did not participate in the creation of the defamatory statements—but have not treated the statute as granting immunity from suit.  *See, e.g., Universal Communications Systems, Inc. v. Lycos, Inc.*, 478 F.3d 413, 418-419 (1st Cir. 2007) (holding that the CDA provided complete immunity to liability to cover any claim that would treat the defendant as a publisher); *Zeran v. American Online, Inc.*, 129 F.3d 327, 330-31 (4th Cir. 1997) (holding that "§ 230 forbids the imposition of publisher liability on a service provider for the exercise of its editorial and self-regulatory functions"); compare *Anthony v. Yahoo Inc.*, 421 F. Supp. 2d 1257, 1262-63 (N.D. Cal. 2006) ("No case of which this court is aware has immunized a defendant from allegations that *it* created content."); *Blumenthal v. Drudge*, 992 F. Supp. 44, 50 (D. D.C. 1998) ("Section 230 does not preclude joint liability for the joint development of content."). Indeed, because the statute itself does not use the term "immunity" nor contain any provision regarding the exercise of personal jurisdiction, it could not withstand a construction that would bar the federal courts from exercising personal jurisdiction.[6] [7]

---

[6]Assuming that, at a later date, the defendants could show that they had not participated in the development of the content at issue in this case, the CDA would immunize the defendants from liability only with regard to those causes of action that rely on treating them as publishers. *See Universal Communications Systems, Inc.*, 478 F.3d at 418-419.  At this time, the defendants have not shown that each cause of action relies on that categorization.

[7]In *Whitney Information Network, Inc. v. Xcentric Ventures, LLC*, 199 Fed. Appx. 738, 741-43 (11th Cir. 2006), a case with which the defendants should be well acquainted, the Eleventh Circuit did address the defendants' CDA "immunity" defense in the context of a motion to dismiss for lack of personal jurisdiction.  However, tellingly, the *Whitney* court did not address the defendants' CDA "immunity" pursuant to its due process analysis but only under its analysis of the Florida long-arm statute, which requires a showing that the out-of-state defendant "commit[ted] a tortious act in Florida" going to the merits of the claim.  *Id.* at 741.  That is, under the construction of Florida's long-arm statute by the Florida Supreme Court, the plaintiff was required to make some showing regarding the commission of the tortious act "through the

22

The distinction between statutory immunity from liability and immunity from suit—that is, immunity from being hailed into federal court at all—is an important one. As the Supreme Court has noted, "[i]t is firmly established in our cases that the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, *i.e.*, the courts' statutory or constitutional power to adjudicate the case." *Steel Company v. Citizens for a Better Environment*, 523 U.S. 83, 88 (1998). Although Steel Company dealt with the distinction between subject matter jurisdiction and ultimate liability, the Court's statement applies equally well to the question of personal jurisdiction. Not all defenses to liability (in fact, very few) implicate the court's power to exercise its jurisdiction over a particular entity or individual. Courts are charged with determining questions of jurisdiction before addressing the merits of the case. *See Northwestern Nat'l Casualty Co. v. Global Moving & Storage Inc.*, 533 F.2d 320, 323 (6th Cir. 1976) (holding that the district court was in error when it addressed the merits of the case "before it determined that it had the requisite personal jurisdiction"). For this reason it is important that the court not confuse questions of jurisdiction with questions of liability on the merits.

In the Eleventh Amendment immunity setting, the courts have recognized states' "immunity from suit" and determined questions of immunity apart from the merits of the

non-resident defendant's telephonic, electronic, or written communications into Florida" in addition to the due process requirements for personal jurisdiction. *Id*. at 742 (citing *Wendt v. Horowitz*, 822 So.2d 1252, 1260 (Fla. 2002). Because Tennessee's long arm statute "extends to the limits of the due process clause . . . the court need only determine whether exercising personal jurisdiction violates due process," *Bridgeport Music, Inc.,* 327 F.3d at 477, and need not rule on the merits of the plaintiff's case at this time. Interestingly, the Eleventh Circuit found that, because the plaintiff had alleged that Xcentric had authored some of the statements posted on the website, CDA immunity did not bar personal jurisdiction under the Florida long-arm statute. *Id*. at 744.

underlying case.  *See Nelson v. La Crosse County Dist. Atty. (State of Wisconsin)*, 301 F.3d 820, 826 (7th Cir. 2002) ("At the very core of sovereign immunity is the inherent right of the sovereign to be immune from private suit."); *see also Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98 (1984) (stating that the "greater significance [of the Eleventh Amendment] lies in its affirmation that the fundamental principle of sovereign immunity limits the grant of judicial authority in Art. III"); *Ku v. State of Tennessee*, 322 F.3d 431, 432 (6th Cir. 2003) (noting that "the Supreme Court is moving in the direction of concluding that, in cases where the district court otherwise has original jurisdiction over the matter, the Eleventh Amendment Immunity defense should be treated in the same way courts have traditionally treated personal jurisdiction rather than as a matter of subject matter jurisdiction").  Additionally, in accordance with specific statutory language in The Foreign Sovereign Immunities Act ("FSIA"), the federal courts have recognized an "immunity from suit" that is intertwined with questions of both personal and subject matter jurisdiction.  *See Maritime International Nominees Establishment v. The Republic of Guinea*, 693 F.2d 1094, 1099-1100 (C.A. D.C. 1982).[8]

However, other forms of immunity, such as federal sovereign immunity, have been treated as defenses to liability, and not as a mechanism for defeating a court's jurisdiction.  *See Houston Community Hosp. v. Blue Cross and Blue Shield of Texas, Inc.*, 481 F.3d 265, 280 (5th Cir. 2007) (agreeing that "[f]ederal sovereign immunity is an immunity from damages only"); *We, Inc. v. City of Philadelphia*, 174 F.3d 322, 326 (holding that "the *Noerr-Pennington* doctrine

---

[8]However, even with regard to the FSIA, federal courts have recognized that, although "a finding of FSIA personal jurisdiction . . . would rest in part on a finding of non-immunity . . . the immunity determination involves considerations distinct from the issue of personal jurisdiction, and the FSIA's interlocking provisions are most profitably analyzed when these distinctions are kept in mind."  *Id.* at 1105, n. 18.

24

does not provide an 'immunity from suit' but rather only a defense against liability").  To summarize, in the absence of direct statutory or Constitutional authority, courts have not permitted defendants to "immunize" themselves from being hailed into federal court on the basis of traditional defenses to liability, even where those defenses are labeled "immunities."

Although courts speak in terms of "immunity" with regard to the protections afforded by the CDA, this does not mean that the CDA has created an "immunity from suit" or otherwise implicated this court's personal jurisdiction.  Rather, the CDA has created a broad defense to liability.  Whether or not that defense applies in any particular case is a question that goes to the merits of that case, and not to the question of jurisdiction. *See We, Inc.*, 174 F.3d at 329 ("[W]e have been unable to find any case holding that the burden of litigation on a private defendant justifies an immunity from suit as well as a defense to liability.")

The importance of this distinction is well-illustrated by the facts at hand.  The plaintiff has alleged, in the Amended Complaint and elsewhere, that the defendants created and developed the alleged defamatory content at issue and, therefore, that the protections afforded by the CDA do not apply in this case.  The defendants have contradicted the plaintiff's allegations in a declaration and in several affidavits provided by employees of defendant Xcentric.  Whether or not the defendants did, in fact, participate in the creation of the alleged content is inextricably tied to the merits of the plaintiff's defamation claim, if not each of its claims, and requires a factual determination that is not appropriately made at this early stage of the litigation. Ruling on that issue requires inquiry into a factual record that will not exist until the parties have been afforded ample time to complete discovery.

Generally, when a court faces questions going to the merits of a case in a Rule 12(b)(2)

25

Case 3:06-cv-01079   Document 40   Filed 05/25/07   Page 25 of 27 PageID #: 551

motion, that motion may be converted to a Rule 12(b)(6) Motion to Dismiss for Failure to State a Claim. *See* 5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1351 (when a defendant raises arguments going to the sufficiency of the claim in a 12(b)(2) motion "the district court may adjudicate the motion and ignore the way it is captioned"); *Larson v. The Port of New York Authority*, 17 F.R.D. 298, 300 (S.D. N.Y. 1955) (holding that, "[n]otwithstanding that [the] movant predicates its motion upon F.R.Civ.P. 12(b)(1) and (2), the motion is deemed one to dismiss for failure to state a claim upon which relief can be granted and will be disposed of accordingly").

In the present case, the defendants' arguments on the merits rely on affidavits and other documents; the defendants do not argue that the Amended Complaint is deficient on its face. Federal Rule of Civil Procedure 12(b) states that, where matters outside the pleadings have been submitted for the court's consideration of a motion to dismiss, the court "shall" treat the motion as a motion for summary judgment and shall give the parties a "reasonable opportunity to present all material made pertinent to such a motion by Rule 56." Fed. R. Civ. P. 12(b). Therefore, in order for the court to consider the defendants' arguments on the merits, the defendants' motion must be analyzed as a Motion for Summary Judgment.

Under Federal Rule of Civil Procedure 56(f), where a party cannot "present by affidavit facts essential to justify the party's opposition, the court may . . . order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just." Additionally, the Sixth Circuit has held that, "[b]efore ruling on summary judgment motions, a district judge must afford the parties adequate time for discovery, in light of the circumstances of the case." *Plott v. General Motors Corp.*, 71 F.3d 1190, 1195 (6th Cir.

26

1995) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 n. 5 (1986) (stressing the importance of allowing ample time for discovery); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (same)).

The plaintiff did not move to lift the stay on discovery pursuant to Rule 56(f), but rather to obtain discovery on arguments the defendants have asserted to defeat jurisdiction. However, the court has found that the defendants' arguments—concerning "immunity" under the CDA—go to the merits of the plaintiffs' claims, and not to jurisdiction. Because the plaintiff's motion to lift stay was predicated on the need to rebut the plaintiff's immunity arguments, the court will grant the plaintiff's motion on the basis of Rule 56(f) and in accordance with the Sixth Circuit's stricture that "a district judge must afford the parties adequate time for discovery" before ruling on a summary judgment motion. *Plott*, 71 F.3d at 1195.

## CONCLUSION

For the reasons stated herein, the Motion to Dismiss for Lack of Personal Jurisdiction filed by the defendant (Docket No. 17) will be **DENIED**. That portion of the Motion to Dismiss going to the merits of the plaintiff's claims will be converted into a Motion for Summary Judgment. In order to develop facts necessary to respond to the defendant's Motion for Summary Judgment, the plaintiff's Motion to Lift Stay on Discovery will be **GRANTED**.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge

Case 3:06-cv-01079   Document 40   Filed 05/25/07   Page 27 of 27 PageID #: 553